## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

ARTIS WHITEHEAD,

             Plaintiff,

          v.

CITY OF MEMPHIS, JAMES HOWELL,
TERRY LYONS, ROBERT RAGLAND,
JOSEPH PEARLMAN, VIVIAN MURRAY,
THOMAS WARRICK, TIMOTHY GREEN,
EDWARD BASS, ROBERT HULL, JR.,
JAMES BOLDEN, and UNKNOWN
EMPLOYEES OF THE CITY OF
MEMPHIS,

             Defendants.

Case No. _____

**JURY DEMAND**

## COMPLAINT

Plaintiff ARTIS WHITEHEAD, by his undersigned attorney, complains of Defendants, CITY OF MEMPHIS, JAMES HOWELL, TERRY LYONS, ROBERT RAGLAND, JOSEPH PEARLMAN, VIVIAN MURRAY, THOMAS WARRICK, TIMOTHY GREEN, EDWARD BASS, ROBERT HULL, JR., JAMES BOLDEN, and UNKNOWN EMPLOYEES OF THE CITY OF MEMPHIS, as states as follows:

### INTRODUCTION

1. Mr. Whitehead was wrongfully convicted and spent nearly two decades in prison for a 2002 robbery at the B.B. King's Blues Club on Beale Street in Memphis, Tennessee – a crime he did not commit.

2. His wrongful conviction was based almost entirely on Defendants' fabrication and suppression of evidence.

3.    There was no legitimate evidence connecting Mr. Whitehead to the crime.

4.    Defendant Officers, in general, and Defendants Howell and Ragland, in particular, fabricated evidence to falsely implicate Mr. Whitehead, including fabricating that an "anonymous tip" purportedly identified him as the robber.

5.    In reality, there was no genuine anonymous tip. Instead, Defendant Officers coerced a man detained for two other armed robberies to phone in a fake tip to the Memphis Crimestoppers tip line falsely implicating Mr. Whitehead in the robbery.  They used this false tip, which they themselves engineered, as justification for their investigation into Mr. Whitehead.

6.    Defendant Officers hid the identity of the armed robber and the true circumstances of the false Crimestoppers call they engineered. They neither disclosed that the armed robber sought a reduced sentence nor that they paid him for fabricating an identification of Mr. Whitehead as the Beale Street robber. Defendant Officers also suppressed information that this armed robber was experienced at falsely implicating people in crimes they did not commit. In fact, he had previously falsely implicated other people in robberies for which they were innocent, and for which he was the true perpetrator.

7.    In addition, Defendant Officers also fabricated false eyewitness identifications of Mr. Whitehead. These identifications were purportedly obtained from victims of the robbery, who—before these Defendant Officers conspired to frame

2

Mr. Whitehead—had described the suspect as at least 7 inches shorter and 50 pounds lighter than Mr. Whitehead.

8.    Defendant Officers knew there was no way that these witnesses could have identified Mr. Whitehead based on the untainted descriptions of the perpetrator that the witnesses gave right after the robbery.

9.    Despite these impossible identifications, Defendant Officers used these witnesses to fabricate identifications against Mr. Whitehead, in order to legitimize the already-fabricated identification of Mr. Whitehead by the Defendant Officers' fake tip.

10.    Defendant Officers suppressed the tactics they used both to coerce the detained, armed robber into falsely implicating Mr. Whitehead, and to fabricate the witness identifications.

11.    Based on the force of the fabricated evidence and the suppression of all exculpatory evidence, Mr. Whitehead was charged, prosecuted, and wrongly convicted of robbery, kidnapping, and assault.

12.    Mr. Whitehead's wrongful conviction is not an isolated occurrence. Rather, his odyssey through the criminal legal system was instigated by a Memphis Police Department that has and continues to devalue the lives of people of color.

13.    Defendant Officers' actions were part of a pattern and practice of systemic police misconduct at the Memphis Police Department, where police officers fabricated evidence, including false identifications, through tactics such as fact-feeding, suggestive identification procedures, payments, and promises of leniency.

14.    Simultaneously, the actions of the Defendant Officers reflect the Memphis Police Department's unwritten custom or policy to withhold exculpatory evidence from criminal defendants.

15.    The policymakers of the Memphis Police Department routinely failed to properly supervise, train, and discipline its police officers, including but not limited to officers who failed to preserve and disclose exculpatory evidence, and failed to refrain from manipulative and coercive conduct, in relation to suspects and witnesses.  Officers knew that the route to promotion was to close cases by any means necessary.

16.    Mr. Whitehead was sentenced to 249 years in prison. He was condemned to die in prison for crimes he never committed.

17.    The truth of what Defendant Officers had done did not remain hidden forever, and ultimately Mr. Whitehead discovered that the Defendant Officers had framed him. He was finally vindicated when the Shelby County Criminal Court considered the "scant evidence" the State had against him. In particular, the Court found that the Memphis Police Department "intentionally hid the identity" of the detained, armed robber and "suppressed this information because they knew that there were problems" with him as the witness.

18.    The Shelby County Criminal Court recognized that Mr. Whitehead had been improperly tried because the jury "assum[ed] that law enforcement conducted a legitimate investigation".

19.    On December 15, 2023, the Shelby County Criminal Court vacated Mr. Whitehead's convictions. That same day, Mr. Whitehead walked out of prison after nearly 21 years in a cage.

20.    Although Mr. Whitehead will never get these lost years of his life back and therefore will never be made whole, this lawsuit seeks to redress the violation of his constitutional rights, obtain compensation for the damage Defendants inflicted upon him, and bring these injustices to light so that similar misconduct never occurs again.

## JURISDICTION AND VENUE

21.    Mr. Whitehead brings this action pursuant to 42 U.S.C. § 1983 and Tennessee law to redress Defendants' tortious conduct and the deprivation under color of law of his rights secured by the United States Constitution.

22.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this complaint occurred in this judicial district.

## PARTIES

23.    Plaintiff Artis Whitehead is 61 years old. He has five children, and five grandchildren. He has been employed as a caregiver and a building security officer since his release from prison after his wrongful incarceration.

24.    At all times relevant to the events described in this complaint, Defendants James Howell, Terry Lyons, Robert Ragland, Joseph Pearlman, Vivian Murray, Thomas Warrick, Timothy Green, Edward Bass, and unknown employees of

the City of Memphis (hereinafter "Defendant Officers") acted under color of law and in the course and scope of their employment.

25.     In addition, Defendants Robert Hull Jr. and James Bolden were at the relevant times the Chiefs of the Memphis Police Department, with supervisory authority over the other Defendant Officers. These Defendants are sued in their individual capacities.

26.     Defendant City of Memphis is a Tennessee municipal corporation.  The City of Memphis is or was the employer of each of the Defendant Officers, who were police officers in the Memphis Police Department at all times relevant hereto. Additionally, the City of Memphis is responsible for the policies and practices of the Memphis Police Department.

## FACTS

### The Beale Street Robbery

27.     On the morning of May 9, 2002, a robber entered the iconic B.B. King's Blues Club on Beale Street in Memphis, Tennessee.

28.     Over the course of approximately one hour, the robber held five people –William Arnold, Lakeisha Pree, James Johnson, Mark Hearn, and Christy Miller— in the basement office of the Club, tying their hands and feet, while he attempted to access the Club's safe.  The robber wounded two of the victims and took some of their money and jewelry.

29.     Since the robber could not open the safe, he went to find Ray Spence, the Club's manager, whom he believed had the combination.  The robber found Spence

arriving at the Club and confronted him.  Spence was able to escape and retreat to safety inside the Club.  The robber then fled the scene.

30. Mr. Whitehead had absolutely nothing to do with the robbery.

**No Eyewitness Description of the Robber Matched Plaintiff**

31. Minutes after the robbery, Defendant Officers, including Defendants Lyons, Murray, and Warrick, responded to the scene of the robbery, investigated the scene, gathered evidence, and spoke to witnesses. Defendant Lyons was responsible for getting information from the witnesses. He ordered officers to bring witnesses to the Memphis Police station to be interviewed.

32. Defendants, including Lyons and Warrick, interviewed Lakina Pree.

33. Pree described the robber as a "little man" and about 5'4 tall.

34. Pree stated that the robber was between 135 and 140 pounds.

35. Defendant Officers, including Lyons, Murray, and Warrick, interviewed Mark Hearn and Christy Miller.

36. Hearn described the robber as approximately 5'9 to 5'10 tall.

37. Miller stated the robber was about 5'8 or 5'9 tall.

38. Both described the robber as having a "slim" build.

39. Defendant Officers, including Green, interviewed James Johnson.

40. Johnson described the robber as between 5'6 and 5'8.

41. Johnson stated the robber was about 150 pounds.

42. Defendant Officers, including Lyons, Warrick, Ragland, and Howell, interviewed Ray Spence.

43. Spence told them that the robber was about 5'6 tall.

44.    Spence described the robber as slim.

45.    Defendant Officers, including Howell and Warrick, interviewed Arnold.

46.    Arnold described the robber as 5'8 tall.

47.    Arnold also stated the robber was about 150 pounds.

48.    Following these interviews, Defendant Officers, including Howell, Lyons, Murray, Warrick, Ragland, and Pearlman agreed that the robber was approximately 5'6 to 5'8.  Afterwards, Defendant Howell sent a memo to Memphis Police officers giving them the robber's description.

49.    Mr. Whitehead was 6'1 tall.

50.    Defendants Howell, Lyons, Murray, and Warrick, in conjunction with Defendants Ragland and Pearlman, agreed that the robber had a "thin build." Defendant Howell communicated this to Memphis Police officers.

51.    Mr. Whitehead did not have a thin build.

52.    He was meaty, muscular, and a habitual weightlifter.

53.    Mr. Whitehead was at least 200 pounds on the day of the robbery, more than 50 pounds heavier than any description provided by any eyewitness.

**Defendants Ignore Evidence of Leads to Suspects Matching the Eyewitnesses' Descriptions and Decide to Pin the Crime on Mr. Whitehead**

54.    The Beale Street robbery soon made the news.

55.    Defendants Lyons immediately compiled witness statements to get a description of the suspect. The news stations were at the scene, and police gave them the suspect's description.

8

56.    Defendant Officers, including Defendant Howell, had composite sketches made of the robber which were published to other officers and members of the public.

57.    There has never been any evidence indicating that a single person identified Mr. Whitehead based on any composite photo.

58.    Defendant Officers, however, received dozens of leads directing them toward suspects that instead matched the eyewitnesses' descriptions of the robber, and the composites.

59.    But Defendant Officers refused to fully investigate these leads, dismissed the information as "rumors", or eliminated leads as suspects without justification.

60.    For several months, Defendant Officers consistently ignored evidence and failed to pursue leads that matched the eyewitnesses' descriptions and their own broadcast of the suspect's description to other officers and the public.  As one court noted, this huge gap in the investigation should have been a "red flag."

61.    Defendants became desperate to pin the crime on someone in the face of mounting public and business community pressure.

62.    During this time, Defendant Officers, including Howell, Ragland, Pearlman, Warrick, and Bass began investigating a man named Gregory Jones, whom they knew had committed multiple armed robberies.

63.    Without any physical evidence to tie Mr. Whitehead to the robbery, Defendant Officers agreed to coerce Jones into helping them fabricate an

identification falsely implicating Mr. Whitehead.

64.    Defendants Officers, including Howell, showed Jones a dark, grainy, photo of Mr. Whitehead, and told him they needed his assistance implicating Mr. Whitehead as the Beale Street robber.

65.    Jones barely knew anything about Mr. Whitehead, except that he spent a great deal of time at work and at the gym.

**Defendants Fabricate Evidence to Frame Mr. Whitehead**

66.    On January 24, 2003, more than eight months after the robbery, Defendant Howell met with Gregory Jones at the police station to discuss the plan to frame Mr. Whitehead.

67.    Defendant Officers, including Defendants Howell and Ragland, offered Jones favors, including money, in exchange for him implicating Mr. Whitehead in the robbery. Defendant Officers also knew that Jones wanted a reduced sentence in exchange for his participation in this scheme and agreed to help him in whatever way they could.

68.    Pursuant to this agreement among Defendants to coerce Jones into falsely implicating Mr. Whitehead, Defendant Howell gave Jones his cell phone to call the Crimestoppers line, and Jones called in an "anonymous tip" that falsely identified Mr. Whitehead as the perpetrator of the Beale Street robbery.

69.    The identification of Mr. Whitehead as the purported robber was demonstrably false.

70.    Defendant Officers knew that it false, and that the only reason Jones

called the Crimestoppers line was because Defendant Officers coerced him into making the call.

71.    Jones later admitted that Defendant Officers used these illegal tactics to coerce him into making this fabricated identification.

72.    Despite the opportunity and ability to intervene, including when Defendant Officers were present in meetings with Gregory Jones, and when they learned about the scheme for Jones to make the false Crimestoppers call, none of the Defendants took any steps to prevent Howell from using unconstitutional tactics to secure a fabricated identification of Mr. Whitehead.

73.    Simultaneously,   Defendants   suppressed   the   police   reports demonstrating that this Crimestoppers tip was a ploy, that Jones had no real information connecting Mr. Whitehead to this crime, and all other evidence of their own misconduct.

### Defendants Conducted Suggestive Identification Procedures and Fabricated the Results

74.    In order to bolster Jones' fabricated identification of Mr. Whitehead, Defendant Officers then manufactured unduly suggestive identification procedures centered on Mr. Whitehead.

75.    Defendant Officers, including Defendants Howell and Pearlman, showed Spence and Pree a six-person photo array with Mr. Whitehead in January 2003—eight months after the Beale Street robbery occurred.

76.    Defendant Officers knew that eight months earlier, Spence and Pree had contemporaneously described a robber that was not Mr. Whitehead. They knew that

all of the eyewitnesses' accounts of the real robber described that person as much shorter and of a lighter weight than Mr. Whitehead.

77.    Defendant Officers therefore knew they needed to take steps to encourage these witnesses to mistakenly identify Mr. Whitehead.

78.    They did so by using suggestive tactics designed to coerce false and fabricated identifications. For example, they designed the photo array process to hide Mr. Whitehead's height and weight, since they knew that by those details alone these witnesses would know that Mr. Whitehead was not the robber they saw at BB King's. As another example, Defendants showed Pree a photo of Mr. Whitehead in a gray shirt, knowing that Pree had previously described the perpetrator as wearing a gray shirt and it would increase the likelihood that she would identify Mr. Whitehead.

79.    Despite all of Defendants' efforts, both Spence and Pree expressed uncertainty during the photo arrays that Mr. Whitehead was the robber they saw.

80.    After the unduly suggestive identification procedures, Defendant Officers claimed that Spence and Pree had positively identified Mr. Whitehead.

81.    They made this claim despite knowing that Spence and Pree had not reliably identified Mr. Whitehead, had expressed uncertainty about their identifications, and had participated in a process designed to procure false identifications.

82.    Defendant Officers hid what they had done to coerce these identifications. For instance, they did not disclose that the witnesses were uncertain, suppressed those statements from witnesses expressing uncertainty during the photo

arrays, and/or suppressed their documentation of those statements.

83.     Defendants have hidden and/or destroyed virtually all evidence of the suggestive photo identification procedures.

84.     Defendant Howell admits that he took a statement from Spence, but that statement has been destroyed or suppressed.

85.     Defendants suppressed the exculpatory evidence that they had fabricated the false identifications of Mr. Whitehead by Spence and Pree, and fabricated police reports concealing that misconduct.

86.     As the Shelby County Court found when vacating Mr. Whitehead's conviction, "the only thing" linking Mr. Whitehead to the crime aside from Jones' fabricated identification were these "two questionable identifications," which were also false.

**Defendants Fabricated and Suppressed Additional Evidence**

87.     In their rush to frame Mr. Whitehead, Defendant Officers, including Defendants Howell, Lyons, Ragland, Pearlman, Murray, Warrick, Green, and Bass, suppressed information about Gregory Jones, who made the "anonymous" call falsely implicating Mr. Whitehead. These actors suppressed the aspects of Jones' involvement that would have allowed Mr. Whitehead and his counsel to uncover the truth about the Defendant Officers' investigation, and to develop evidence that would have led to Mr. Whitehead's acquittal.

88.     Defendants Officers withheld information about their fabricated tip implicating Mr. Whitehead in the robbery. For example, Defendant Officers,

including Defendants Howell, Ragland, and others, knew, but failed to disclose, that Jones received hundreds of dollars in compensation to help frame Mr. Whitehead.

89.     As another example, Defendants knew, but failed to disclose, that Jones had provided false information inculpating innocent people in other robberies at the same time that he helped these Defendant Officers frame Mr. Whitehead.

90.     Defendants' suppression of this information deprived Mr. Whitehead of the opportunity to impeach the Defendants Officers and thereby establish his innocence.

91.     Instead, Defendants rushed to frame Mr. Whitehead and withheld and suppressed the truth about Jones.

92.     Moreover, pursuant to their agreements, Defendants, including Defendants Howell, Lyons, Ragland, Pearlman, Murray, Warrick, Green, and Bass, suppressed, withheld, or destroyed additional exculpatory evidence. This additional evidence included, but was not limited to, evidence of the agreement reached between Defendants Howell, Lyons, Ragland, Pearlman, Murray, Warrick, Green, and Bass to fabricate false evidence against Mr. Whitehead, including evidence of all the communications between these Defendants in forming, discussing, and acting in the furtherance of the agreement, which would have served as powerful evidence to impeach the testimony of these Defendants at Mr. Whitehead's trial, as well as powerful independent evidence of his innocence.

93.     Defendants never disclosed these additional pieces of exculpatory evidence to the prosecution or defense prior to Mr. Whitehead's conviction in 2003.

94.     In addition, Defendant Officers including Howell, Lyons, Ragland, Pearlman, Murray, Warrick, Green, and Bass suppressed extensive exculpatory information they had of numerous other leads pointing to a perpetrator that was not Mr. Whitehead, which would have discredited their case against Mr. Whitehead and otherwise aided Mr. Whitehead's defense.

95.     Throughout the course of the Beale Street robbery investigation, Defendant Officers, including Defendants Howell, Lyons, Ragland, Pearlman, Murray, Warrick, Green, and Bass, kept one another informed regarding developments in the investigation, the evidence being fabricated to falsely implicate Mr. Whitehead, and the exculpatory evidence that had been suppressed, withheld, and/or destroyed.

96.     Each of these Defendants agreed that they would take whatever steps necessary to implicate a suspect and develop evidence to secure a conviction for the crime, without regard for the constitutional rights of the individuals involved, the legality of their tactics, or the truth or falsity of the evidence they would develop. Pursuant to this agreement, Defendants fabricated evidence against Mr. Whitehead, suppressed evidence, and otherwise conspired to frame Mr. Whitehead for a crime he did not commit.

97.     Each of these Defendants was, at various points, physically present with other officers while fabrication and suppression of evidence was evident and/or discussed.

98.     At no point did any of these Defendants reveal the existence of the

fabricated or suppressed evidence, protest or speak out, or take any steps to intervene in any way to stop the violation of Mr. Whitehead's rights. The individual Defendants failed to intervene to bring these issues to light pursuant to the agreement they had amongst themselves to frame Mr. Whitehead for the Beale Street robbery regardless of his innocence.

## Policy and Practice of Wrongly Convicting Innocent Individuals

99.    The misconduct by the Defendant Officers, described in detail above, was undertaken pursuant to the policies and practices of the Memphis Police Department.

100.    Mr. Whitehead was the victim of, and his injuries were proximately caused by, policies and practices on the part of the Memphis Police Department to pursue and secure false convictions through profoundly flawed investigations and unconstitutional methods and tactics.

101.    At the time of the Memphis Police Department's investigation into the 2002 Beale Street robbery, in the period leading up to Mr. Whitehead's wrongful conviction in 2003, and for a period continuing thereafter, the Memphis Police Department, including some or all of the Defendant Officers in this case, engaged in a systematic pattern of fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

102.    For example, at the time he led the Beale Street robbery investigation, Defendant Howell's supervisors and policymakers within the Memphis Police

Department, including Chiefs of Police Robert Hull, Jr. and James Bolden, were well aware that Defendant Howell violated the civil rights of people he encountered in the course of his job, and acted without regard for the legality of his tactics.

103.    Defendant Howell was known within the Memphis Police Department at this time as its "bulldog" because he would "not let go" of his targeted suspects until he secured an arrest and conviction, no matter the cost.

104.    Defendant Howell also had a lengthy disciplinary record, including allegations of criminal conduct and assault.  Three years before his illegal tactics against Mr. Whitehead, Howell and another Memphis police officers were suspended from duty for 40 days for violating a suspect's civil rights and attempting to cover up their own misconduct.

105.    Specifically, Defendant Howell has a history of lying, to such an extent the FBI initiated an investigation into him and other officers prior to 2002. The Memphis Police Department was aware of the FBI's investigation into Howell for lying prior to him leading the Beale Street investigation.

106.    As another example of illegal tactics, Defendant Green was known with the Memphis Police Department for conspiring with criminals. In 2012, Defendant Green was convicted of conspiracy alongside two other Memphis Police Officers for collecting payments from criminals in exchange for warning them about the police department's criminal investigations against them.

107.    At the time of the Beale Street investigation, the Memphis Police Department knew that Defendant Officers, including Howell, were also biased and

too often treated people of color they encountered on Beale Street as criminals. Defendant Howell has admitted that he "hated" the environment in the entertainment district of Beale Street. He hated it "with a passion".

108.    The Memphis Police Department too often devalued the lives of people of color. Defendant Howell has admitted that he had a "disdain" for them, and had become "hardened" after investigating cases.

109.    Defendant Howell has admitted that he felt like a soldier in a "war". Similarly, the current Chief of the Memphis Police Department, Cerlyn Davis, has admitted to the "wolf pack mentality" amongst officers in the Memphis Police Department that contributes to unconstitutional practices.

110.    Before the investigation at issue here and continuing afterwards, dozens of cases have come to light in which Memphis Police officers were involved in suppressing exculpatory evidence or fabricating false evidence to cause the conviction of an innocent person for serious crimes they did not commit. These cases include many in which Memphis Police officers used the same tactics Defendant Officers employed against Plaintiff in this case, including fabricating evidence, concealing exculpatory evidence, manipulating eyewitness identifications, and using other tactics to secure arrests, prosecutions, and convictions without probable cause and without regard for the targets' actual guilt or innocence.

111.    In 2002, before Mr. Whitehead's wrongful conviction, Memphis Police officers unjustly killed Jeffrey Robinson, and fabricated evidence by placing a box cutter next to him in an attempt to create probable cause for the shooting. These

officers also made false statements regarding the investigation and suppressed evidence of their misconduct.

112.   In 2011, Erskine Johnson's conviction was vacated after he spent nearly three decades in prison, including 20 years on death row, for a 1983 murder that he did not commit. To secure Johnson's conviction, Memphis Police officers withheld exculpatory evidence, including statements of witnesses who did not identify Johnson and unduly suggestive identification procedures, including evidence that police officers tried to coerce witnesses into identifying Johnson after showing them his photos.

113.   In 2023, the Memphis Police officers beat and killed a 29-year Black man, Tyre Nichols, after pulling him from his car after a traffic stop. Afterwards, they conspired to cover up their actions and withheld material evidence, fabricated statements, and tampered with witnesses.

114.   The U.S. Department of Justice launched a 17-month investigation into the Memphis Police Department's policing practices following Nichols's death. The DOJ's preliminary investigation revealed that officers' actions were not an isolated episode, but instead reflected an aggressive approach that officers routinely took with Black people — particularly officers investigating high-crime areas.

115.   The City of Memphis objected to the DOJ launching an investigation into its policing practices and failure to hold its officers accountable.  Mayor Jim Strickland expressed disappointment in the investigation and proclaimed that the "the culture in the police department is a good culture and it abides by the

19

constitution." Strickland further stated that the DOJ would find that Memphis Police officers were "following the constitution."

116.  On December 4, 2024, the DOJ issued a report finding that the Memphis Police Department was engaged in unconstitutional policing practices.

117.  According to the report, MPD's unconstitutional policing practices are "caused in part by MPD's deficient policies, supervision, training, and accountability systems." In particular, the DOJ concluded that "MPD policies lack clear guidance on constitutional standards" and "MPD does not give officers clear guidance on what they can and cannot do." With regard to training, the DOJ determined that "MPD does not provide effective training to recruits or current officers on constitutional practices" and that officers "rarely receive" training beyond legal updates.

118.  On the subject of supervision, the DOJ concluded among other things that "supervisors and commanders have overlooked or try to justify legal violations" and that "supervisors also fail to conduct adequate investigations; instead, they overlook or try to justify violations". The DOJ confirmed that this is not limited to a few officers, but that "MPD does not consistently accept misconduct allegations, complete thorough investigations, or discipline officers when warranted. Most complaints do not receive a full investigation, with witness interviews and other investigative steps." For example, between 2018 and 2022, MPD reported that its internal affairs division opened an investigation into "just 20.6 percent of complaints received"; and for the "few sustained allegations, MPD does not impose appropriate

discipline. As a result, MPD officers engaged in repeated misconduct, harming community members and costing taxpayers millions of dollars."

119.    On the same day that the DOJ issued its findings, Mayor Paul Young and Police Chief Davis expressed concern about the "constraint" of federal oversight of the Memphis Police Department. Mayor Young did not think federal intervention was "wise."

120.    This pattern of the Memphis Police Department's misconduct pre-dates and outlasts the Beale Street robbery investigation, demonstrating that the misconduct perpetrated against Mr. Whitehead was the product of long-established policies and practices at the Memphis Police Department and longstanding disregard for the constitutional rights of criminal suspects.

121.    Dating back to 1970s, dozens of Memphis Police Officers formed the Afro American Police Association to address the misconduct perpetrated by the Memphis Police Department against people of color, including the fabrication and withholding of evidence. In 1973, James Bolden, who served as Police Chief when Mr. Whitehead was sentenced, admitted that had had great "concern" about the misconduct perpetrated on Black male suspects by police officers.

122.    The suppression of evidence by Memphis Police officers also dates back to well before Mr. Whitehead's arrest.  In 1976, the Memphis Police Department came under scrutiny for a massive suppression of evidence. After a lawsuit filed by the ACLU and a later court's order directing the Memphis Police Department to preserve reports and investigative files, including files documenting alleged confidential

informants, the Department proceeded with destroying the files anyway, turning them to ash at a city incinerator on the mayor's instruction.

123.    At all relevant times, members of the Memphis Police Department, including Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the police department and never disclosed to the participants of the criminal legal system. As a matter of widespread custom and practice, these clandestine files were withheld from the District Attorney's Office and from criminal defendants, and were routinely destroyed or hidden during or at the close of the investigation rather than being preserved as part of the official file.

124.    Consistent with the municipal policy and practice described in the preceding paragraph, Defendant Officers concealed exculpatory evidence from Mr. Whitehead.

125.    In addition, the City of Memphis and the Memphis Police Department routinely failed to investigate cases in which Memphis police detectives recommended charging an innocent person with a serious crime with scant evidence, and rarely has any Memphis Police officer has ever been disciplined as a result of their misconduct in any of those cases.

126.    Before and during the period in which Mr. Whitehead was falsely charged with and convicted of the Beale Street robbery, the City of Memphis also operated a dysfunctional disciplinary system for Memphis police officers accused of

serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

127.    Since before Mr. Whitehead's arrest and continuing for years afterward, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Memphis Police Department. In accordance with this code, officers refused to report, were complicit in, and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

128.    As a result of the City of Memphis's established practices, and prior to the Beale Street robbery investigation, Defendant Officers came to believe that they could violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. The practices that enabled this belief include failing to track and identify police officers who were repeatedly accused of serious misconduct, failing to investigate cases in which the police were implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Memphis Police Department. As a result of these policies and practices of the City of Memphis, members of the Memphis Police Department acted with impunity when they violated the constitutional and civil rights of citizens.

129.    Defendants engaged in such misconduct because they had no reason to fear that the City of Memphis and its police department would ever discipline them for doing so.

130.    Today, there are dozens of known cases in which Memphis police officers engaged in the serious investigative misconduct described above. They engaged in such misconduct because they had no reason to fear that their supervisors would ever discipline them for doing so.

131.    The City of Memphis and its police department also failed, in the years prior to Mr. Whitehead's conviction, to provide adequate training to Memphis police officers in many areas, including the following:

- The conduct of physical lineups, photographic arrays, and other identification procedures.

- Preserving material evidence, such as interviews, physical lineups and photographic arrays used for identification purposes.

- The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

- The need to refrain from psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

- The risks of wrongful convictions and the steps police officers should take to minimize risks.

- The risks of engaging in tunnel vision during investigations.

- The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Memphis police officers as alleged in the preceding paragraph caused Mr. Whitehead's wrongful conviction and his injuries.

132.  The City's failure to train, supervise, and discipline its officers, including Defendants Howell, Lyons, Ragland, Pearlman, Murray, Warrick, Green, and Bass, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Mr. Whitehead in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

133.  The City of Memphis and final policymaking officials within the Memphis Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Whitehead's ongoing injuries.

134.    The policies and practices described in the foregoing paragraphs were also approved by the City of Memphis's policymakers, including Defendant Hull, Jr. and Bolden, who were deliberately indifferent to the violations of constitutional rights described herein.

**Plaintiff's Conviction**

135.    Mr. Whitehead's criminal trial was made unfair by the Defendant Officers' misconduct.

136.    Without any physical evidence to tie Mr. Whitehead to the Beale Street robbery, prosecutors had to rely on the Defendant Officers' fabrication of false evidence and suppression of exculpatory evidence to convict Mr. Whitehead.

137.    For crimes that Mr. Whitehead did not commit, he was sentenced to 249 years in prison.

**Plaintiff's Exoneration**

138.    Mr. Whitehead never gave up fighting to prove his innocence.

139.    At the time of the robbery, Mr. Whitehead was nowhere near the scene of the crime.

140.    On December 15, 2023, after years of post-conviction advocacy by Mr. Whitehead, the Shelby County Criminal Court vacated Mr. Whitehead's wrongful convictions.

141.    That same day, Mr. Whitehead walked out of prison as a free man and finally returned home to his family and friends after more than 20 years of wrongful imprisonment.

**Plaintiff's Damages**

142.    Plaintiff was 41 years old, in the prime of his adult life, at the time that he was wrongfully arrested and then convicted of a crime he did not commit.

143.    Instead, he would spend nearly 21 years incarcerated for something he did not do.

144.    Plaintiff's whole life was turned upside down without any warning. Defendants' misconduct caused Plaintiff unfathomable damages. For example, because of Defendants' misconduct, Plaintiff has missed out on participating in the lives of his family and friends. At the time he was incarcerated, he was the father of young children, and every day of his incarceration was a day he could not be physically present in his children's lives.

145.    Plaintiff was also deprived of opportunities to engage in meaningful labor, to develop a career, and to pursue his interests and passions. For over two decades, Plaintiff was deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

146.    During his over twenty years of wrongful incarceration, Plaintiff was detained in harsh and dangerous conditions in maximum security prisons.

147.    During his decades of wrongful imprisonment, Plaintiff lived in constant emotional anguish, never knowing whether the truth would come out and whether he would ever be exonerated.

148.    Defendants' misconduct not only caused the severe trauma of wrongful

imprisonment and Plaintiff's loss of liberty but continues to cause Plaintiff ongoing health effects to this day, including extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects.

**COUNT I**
**42 U.S.C. § 1983**
**Fabrication of False Evidence in Violation of Due Process**
**(Fourteenth Amendment)**

149.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

150.    In the manner described more fully above, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and due process by fabricating evidence, including witness statements implicating Plaintiff in crimes he did not commit, which Defendants knew to be false, and by suppressing their own misconduct and the circumstances in which these witness statements were obtained.

151.    As described more fully above, Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, suborned perjury, obtained Plaintiff's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

265. For example, as described more fully above, Defendant Officers knowingly used Gregory Jones to create a false tip implicating Plaintiff in the Beale Street robbery.

269.   In addition, Defendants fabricated additional evidence that is not yet known to Plaintiff.

270.   Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

271.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

267. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Memphis Police Department, in the manner more fully described below in Count VII.

**COUNT II**
**42 U.S.C. § 1983**
**Suppression and Withholding of Exculpatory Evidence**
**in Violation of Due Process**
**(Fourteenth Amendment)**

272.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

273.    As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

274.    In the manner described more fully above, Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

275.    In addition, the Defendants concealed additional evidence that is not yet known to Plaintiff.

276.    Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

277.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

278.   The misconduct in this Count by the Defendants was undertaken pursuant to the policy and practice of the Memphis Police Department, in the manner more fully described below in Count VII.

**COUNT III**
**42 U.S.C. § 1983**
**Unlawful Arrest**
**(Fourth and Fourteenth Amendments)**

269.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

270.   In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured and suppressed exculpatory evidence to accuse Plaintiff of criminal activity and cause the unlawful arrest of Plaintiff, without probable cause.

271.   In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

272.   For example, in order to procure the warrant for Plaintiff's arrest, Defendant Officers knowingly and deliberately, or with a reckless disregard for the truth, made false statements and/or omissions that created a falsehood.   Such

statements and/or omissions were material, or necessary, to the finding of probable cause against Plaintiff.

273.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

274.    As a direct and proximate result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

275.    The misconduct in this Count by the Defendants was undertaken pursuant to the policy and practice of the Memphis Police Department, in the manner more fully described below in Count VII.

## COUNT IV
### 42 U.S.C. § 1983
### Malicious Prosecution
### (Fourth and Fourteenth Amendment)

269.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

270.    In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured and suppressed exculpatory evidence to accuse Plaintiff of criminal activity and cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

271.    In so doing, these Defendant Officers caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth Amendment and Fourteenth Amendment.

272.    These Defendant Officers initiated and continued a criminal prosecution against Plaintiff maliciously, resulting in injury.

273.    Defendant Officers made, influenced, and/or participated int eh decision to prosecute Plaintiff.

274.    The judicial proceedings against Plaintiff were terminated in his favor when his criminal convictions were vacated and all charges against him were dismissed.

275.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

276.    As a direct and proximate result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

277.    The misconduct in this Count by the Defendants was undertaken pursuant to the policy and practice of the Memphis Police Department, in the manner more fully described below in Count VII.

## COUNT V
## 42 U.S.C. § 1983
## Failure to Intervene

278.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

279.   In the manner described above, during the Constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct.

280.   As a direct and proximate result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, he sustained and continues to sustain injuries, including physical injury and sickness and resultant emotional pain and suffering.

281.   These Defendant Officers had a reasonable opportunity to  prevent this harm, but failed to do so.

282.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with  willful indifference to Plaintiff's constitutional rights.

283.   The Defendant Officers' misconduct described in this Count was undertaken pursuant to the City of Memphis's policy and practice in the manner more fully described above and in Count VII.

## COUNT VI
### 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

284.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

285.    Prior to arresting Plaintiff, the Defendants reached an agreement amongst themselves to frame Plaintiff for the crime, and to thereby deprive Plaintiff of his constitutional rights, all as described in the various Paragraphs of this Complaint.

286.    In addition, before and after Plaintiff's conviction, each of the Defendants further conspired, and continues to conspire, to deprive Plaintiff of exculpatory materials to which he is lawfully entitled, and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

287.    In this manner, the Defendants, acting in concert with each other and with other unknown co-conspirators, including persons who are and who are not members of the Memphis Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

288.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

289.    As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he sustained and continues to sustain

injuries, including physical injury and sickness and resultant emotional pain and suffering.

290.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

291.    The Defendant Officers' misconduct described in this Count was undertaken pursuant to the City of Memphis's policy and practice in the manner more fully described above.

292.    The Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

293.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

294.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

295.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

296.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and

emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

297.    The misconduct in this Count by the Defendants was undertaken pursuant to the police and practice of the Memphis Police Department, in the manner more fully described above and in Count VII.

**COUNT VII**
**42 U.S.C. § 1983**
**Policy and Practice Claim Against the City of Memphis**

298.    Plaintiff incorporates each paragraph of this Complaint as if restated fully herein.

299.    As described more fully herein, the City of Memphis is itself liable for the violation of Plaintiff's constitutional rights.

300.    Plaintiff's injuries were caused by the policies, practices, and customs of the Memphis Police Department, in that employees and agents of the Memphis Police Department regularly fabricated false evidence implicating criminal defendants in criminal conduct, such as by using the improper tactics described above to fabricate false witness statements; failed to disclose exculpatory evidence to criminal defendants; pursued wrongful convictions through profoundly flawed investigations; and otherwise violated due process in a similar manner that alleged herein.

301.    The above-described widespread practices and customs, which were so well-settled as to constitute the de facto policy of the Memphis Police Department, were allowed to exist because municipal policymakers with authority over the same, including but not limited to Chiefs of Police Hull, Jr. and Bolden, either tolerated or

acquiesced to the problem, thereby effectively ratifying it. Defendants' tactics were supported by high-ranking supervisors in the Investigations Division, as well as the Robbery Bureau.

302.    Furthermore, the above-described widespread practices were allowed to flourish because the Memphis Police Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who fabricated false evidence and witness testimony, withheld material evidence, and pursued wrongful convictions.

303.    The constitutional violations described in this complaint were also undertaken pursuant to the policies and practices of the Memphis Police Department in that the constitutional violations against Mr. Whitehead were committed with the knowledge or approval of persons with final policymaking authority for the City of Memphis and the Memphis Police Department, or were actually committed by persons with such final policymaking authority.

304.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Memphis and the Memphis Police Department, including but not limited to Defendants Howell, Lyons, Ragland, Pearlman, Murray, Warrick, Green, and Bass, who acted pursuant to one of more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

305.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and

proximately caused Plaintiff to suffer grievous and permanent injuries and damages set forth above.

## COUNT VIII
### Supervisory Liability

306.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

307.   The constitutional injuries complained of herein  were proximately caused by a pattern and practice of misconduct,  which occurred with the knowledge and consent of those of the  Defendant Officers who acted in a supervisory capacity, including but not limited to Defendants Hall, Jr. and Bolden, who served as  Chiefs of the Memphis Police Department at the relevant times,  such that these officers personally knew about, facilitated,  approved, and condoned this pattern and practice of misconduct,  or at least recklessly caused the alleged deprivation by their  actions or by their deliberately indifferent failure to act.

308.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

309.   As a direct and proximate result of this misconduct, Plaintiff sustained and continues to sustain injuries, including physical injury and sickness and resultant emotional pain and suffering.

310.   Absent knowing participation by the command personnel responsible for supervising the Defendant Officers, the misconduct alleged in this Complaint could not have occurred.

311.   The Defendant Officers' misconduct described in this Count was

undertaken pursuant to the City of Memphis's policy and practice in the manner more fully described above.

312.   In the manner described more fully above, Defendant Officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

313.   In so doing, these Defendant Officers caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

314.   Plaintiff's criminal prosecution was terminated in his favor, in a manner indicative of innocence.

315.   Defendants' actions were taken under color of law and within the scope of their employment.

316.   As a result of Defendants Officers' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIV
### State Law Claim
### Malicious Prosecution

317.   Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

318.   In the manner described more fully above, Defendant Officers accused

Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

319.   In so doing, these Defendant Officers caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

320.   Plaintiff's criminal prosecution was terminated in his favor, in a manner indicative of innocence.

321.   Defendant Officers' actions were taken under color of law and within the scope of their employment.

322.   As a result of Defendant Officers' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim
### Intentional Infliction of Emotional Distress

323.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

324.   Defendant Officers' actions, omissions, and conduct, as set forth above, were extreme and outrageous.

325.   These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or with reckless disregard for the probability

that they would cause, Plaintiff severe emotional distress, as more fully alleged above.

326.    As a direct and proximate result of the Defendants, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT XI
## State Law Claim
## Civil Conspiracy

327.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

328.    As described more fully in the preceding paragraphs, Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means.

329.    In furtherance of the conspiracy, Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

330.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

331.    As a direct and proximate result of this misconduct, Plaintiff sustained and continues to sustain injuries, including physical injury and sickness and resultant severe emotional pain and suffering.

**COUNT XII**
**State Law Claim**
***Respondeat Superior***

332.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

333.    While committing the misconduct alleged in the preceding paragraphs, Defendants Howell, Lyons, Ragland, Pearlman, Murray, Warrick, Green, and Bass, were employees, members, and agents of the City of Memphis, acting at all relevant times within the scope of their employment.

334.    Defendant City of Memphis is liable as principal for all state law torts committed by its agents.

**COUNT XIII**
**State Law Claim**
**Indemnification**

335.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

336.    In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and  agents of, the Memphis Police Department, acting at all relevant  times within the scope of their employment and under color of law.

WHEREFORE, Plaintiff Artis Whitehead, respectfully requests that this Court enter a judgment in his favor and against Defendants the City of Memphis; and  Howell, Lyons, Ragland, Pearlman, Murray, Warrick, Green, Bass, and Unknown Employees of the City of Memphis, awarding compensatory damages,

attorneys' fees, costs, and pre- and post-judgment interest against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the Defendant Officers, and any other relief that this Court deems just and appropriate.

### JURY DEMAND

Plaintiff Artis Whitehead hereby demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.


Dated:  December 12, 2024                         Respectfully submitted,

                                                 ARTIS WHITEHEAD

                                                 By: /s/ Margaret Gould
                                                 *One of Plaintiff's Attorneys*


Jonathan Loevy, Illinois Bar No. 6218254*
jon@loevy.com
Tara Thompson, Illinois Bar No. 6279922*
tara@loevy.com
Quinn K. Rallins, Illinois Bar No. 6339556*
rallins@loevy.com
Margaret Gould, New York Bar No. 5971114 (admitted to this Court)
gould@loevy.com
*These attorneys will be seeking pro hac vice admission.*

LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900